UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Reworld Sumter Industrial, LLC,<br><br><br>Plaintiff,<br>v.<br>VEP Environmental LLC, Vaquero Energy Partners LLC, Scott Huard, Daniel Gordon, and Gary Higginbotham,<br><br>Defendants. | C.A. NO. 3:25-cv-5128-JDA |

## <u>VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

Plaintiff Reworld Sumter Industrial, LLC ("Reworld" or "Plaintiff") files the following Verified Complaint for Damages and Injunctive Relief against Defendants VEP Environmental LLC ("VEP Environmental"), Vaquero Energy Partners LLC ("Vaquero"),[1] Scott Huard ("Huard"), Daniel Gordon ("Gordon"), and Gary Higginbotham ("Higginbotham").[2]

## I.     <u>INTRODUCTION</u>

1.     This is a story of ambition crossed with betrayal – a case in which a fledgling company has attempted to jump start its business by siphoning the success, secrets, and systems of Plaintiff.

2.     To execute this plan, VEP collaborated and conspired with certain former employees of Plaintiff who are bound by restrictive covenant agreements ("RCAs").

3.     Using their prior relationships with and related access to Plaintiff, Defendants infiltrated Plaintiff's operations to surreptitiously steal and use Plaintiff's trade secret and

---

[1]  VEP Environmental and Vaquero are collectively referred to as "VEP."
[2] Gordon, Huard, and Higginbotham are collectively referred to as "Individual Defendants." The Individual Defendants and VEP are collectively referred to as "Defendants."

confidential information, usurp Plaintiff's business opportunities, and to tortiously interfere with Plaintiff's contractual and prospective contractual relationships.

4.      Defendants' unlawful efforts have already resulted in it undercutting Plaintiff's pricing and using the confidential information and contacts obtained by Plaintiff's former employees to win a multi-million dollar bid from one of Plaintiff's clients.

5.      Plaintiff recently learned that VEP's bid to one of Plaintiff's clients was selected over Plaintiff's and that VEP and the Individual Defendants worked together to ensure that VEP won the bid over Plaintiff.  Defendants have also solicited and targeted Plaintiff's other clients and business opportunities in violation of valid and enforceable contracts.

6.      Unless enjoined by this Court, VEP will continue to encourage, aid, and benefit from the Individual Defendants' willful violation of their RCAs and legal obligations with impunity, causing Plaintiff irreparable harm to its goodwill, client relationships, trade secret and confidential information, and skilled and trained workforce.

7.      Plaintiff also seeks damages for the harm already caused by Defendants and for severe penalties for their willful misconduct.

## II.     <u>PARTIES, JURISDICTION AND VENUE</u>

8.      The Individual Defendants all signed RCAs with Sumter Transport Company at the initiation of their employment relationships.

9.      Copies of the RCAs signed by Huard on December 21, 2016, are attached as **Exhibits 1 and 2**. A copy of the RCA signed by Gordon on December 3, 2012, is attached as **Exhibit 3**, and a copy of the RCA Gordon signed reconfirming these confidentiality obligations on July 27, 2015, is attached as **Exhibit 4**. A copy of the RCA executed by Higginbotham in September 2013 is attached as **Exhibit 5**. He reaffirmed his confidentiality obligations by signing

an additional RCA on July 23, 2015, which is attached as **Exhibit 6**. Higginbotham later agreed to additional restrictive covenants related to him receiving certain class B incentive units.

10.     In June of 2018, Sumter Transport Company converted from a corporation to a limited liability company and changed its name to STC Industrial, LLC. (**Exhibit 7**).

11.     STC Industrial, LLC subsequently changed its name to Reworld Sumter Industrial, LLC, which is the properly named Plaintiff in this lawsuit.

12.     Plaintiff is a limited liability company that provides sustainable waste removal and recycling solutions to businesses and communities.

13.     Plaintiff maintains an office and conducts business in Sumter, South Carolina.

14.     Plaintiff's sole member is Reworld Sumter, LLC, a South Carolina limited liability company.

15.     Reworld Sumter, LLC's sole member is STC Group, LLC, a Delaware limited liability company.

16.     STC Group, LLC's sole member is STC Parent, Inc., a Delaware corporation.

17.     None of Plaintiff's applicable LLC members are South Carolina residents.

18.     Huard was an employee of Plaintiff from December 2016 until his resignation on or about March 19, 2025.

19.     Huard lives in Texas, but performed substantial work for Plaintiff in South Carolina, including making trips to South Carolina for work reasons and receiving confidential information about Plaintiff's clients and operation in South Carolina.

20.     Huard's RCAs with Plaintiff contain a valid and enforceable South Carolina choice of law and South Carolina choice of forum provisions.

21.     Gordon was an employee of Plaintiff from July 2012 until his resignation on or around April 7, 2025.

22.     Gordon is a South Carolina resident and performed substantial work for Plaintiff in South Carolina, including managing Plaintiff's client relationships, some of which are in South Carolina; receiving confidential information about Plaintiff's clients and operations in South Carolina; and soliciting and servicing clients for Plaintiff in South Carolina.

23.     One of Gordon's RCAs with Plaintiff contains a South Carolina choice of law or choice of forum provision.  Additionally, South Carolina law and forum apply because Gordon is a resident of South Carolina, signed his RCA in South Carolina, worked for Plaintiff in and from South Carolina, and a substantial portion of his misconduct and breaches occurred in South Carolina.

24.     Higginbotham was an employee of Plaintiff from September of 2013 until his separation on June 5, 2025.

25.     Higginbotham lives in Texas, but performed substantial work for Plaintiff in South Carolina, including making trips to South Carolina for work reasons; supervising employees in South Carolina; managing Plaintiff's client relationships, some of which are in South Carolina; receiving confidential information about Plaintiff's clients and operation in South Carolina; and soliciting and servicing clients for Plaintiff in South Carolina.

26.     Higginbotham's 2015 RCA with Plaintiff contain a valid and enforceable South Carolina choice of law and South Carolina choice of forum provisions.

27.     The Individual Defendants have worked and are working with VEP and are actively misappropriating Plaintiff's trade secret and confidential information, unlawfully competing with Plaintiff, and have and are attempting to solicit and divert Plaintiff's clients and employees.

28.     Vaquero is a trading partner for Reworld in the oil markets and is a current direct competitor.

29.     Vaquero is a Texas-based LLC with offices in Houston, Texas and Indianapolis, Indiana.

30.     Upon information and belief, Vaquero conducts business in South Carolina, and its tortious conduct, as described herein, occurred at least in part in South Carolina.

31.     Upon information and belief, VEP Environmental is a subsidiary of and/or affiliated with Vaquero.

32.     VEP Environmental is a Texas-based LLC with an office in Galena Park, Texas.

33.     Upon information and belief, VEP Environmental conducts business in South Carolina, and its tortious conduct, as described herein, occurred at least in part in South Carolina.

34.     Upon information and belief, Huard is an employee, agent, independent contractor, and/or has an ownership/investment interest in VEP.

35.     Defendants are subject to the jurisdiction of this Court.

36.     This Court possesses diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and 28 U.S.C. §1367.

37.     The citizenship of a limited liability company is determined by the citizenship of all its members and not its state of formation and principal place of business. *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120 (4th Cir. 2004).

38.     Therefore, for the purposes of diversity jurisdiction, Plaintiff is considered a citizen of Delaware; Vaquero is considered a citizen of Indiana and California (based on the residence of its members); and VEP Environmental is considered a citizen of Texas (based on the residence of its members).

39.    Neither VEP Environmental nor Vaquero have members who are residents of Delaware.

40.    Huard and Higginbotham are citizens of Texas and Gordon is a citizen of South Carolina. Accordingly, this controversy is between citizens of different states.

41.    Clients of Plaintiff whom the Individual Defendants solicited, serviced, and to whom they sold products and services, generate annual revenue for Plaintiff well in excess of $75,000.

42.    Defendants are attempting to steal business from Plaintiff that is valued well in excess of $75,000.  Defendants have already stolen one business opportunity away from Plaintiff that was worth well over $4,000,000.00.

43.    Defendants are actively attempting to appropriate as much of Plaintiff's business as possible, including misappropriating trade secret and confidential information, to develop, launch, and sustain VEP, and to harm Plaintiff and gain an unfair competitive advantage.

44.    As a result, Defendants have been and continue to be unjustly enriched, with the benefit derived from its exploitation of Plaintiff's proprietary information to far exceed $75,000.00. Therefore, the amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

45.    This Court also has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331.

46.    Plaintiff alleges violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA"). This claim arises under the laws of the United States over which this Court has original federal question jurisdiction.

47.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

### III.     FACTS

#### A. THE RCAS

48.     Plaintiff hired Huard on or about December 19, 2016. Prior to his resignation, Plaintiff employed Huard as its Manager, Business Development.

49.     As part of Huard's initial employment, he executed a Confidential Information and Intellectual Property Agreement ("Huard Confidentiality Agreement"). (**Exhibit 1**).

50.     The Huard Confidentiality Agreement contains industry-standard and narrowly tailored restrictive covenants.

51.     In the Huard Confidentiality Agreement, Huard agreed to abide by reasonable restrictions governing the retention, use, and disclosure of Plaintiff's confidential information.

52.     Specifically, he committed to maintaining the confidentiality of such information and to refrain from disclosing it at any time without Plaintiff's consent, except to partners, employees, or authorized agents of Plaintiff. (**Exhibit 1**, **¶ 1**).

53.     In the Huard Confidentiality Agreement, Huard also agreed to comply with reasonable restrictions concerning the disclosure of Plaintiff's intellectual property.

54.     Specifically, he pledged not to disclose any such intellectual property unless he held all rights to it or had provided written notice to, and obtained written authorization from, Plaintiff or an authorized third party. (**Exhibit 1**, **¶ 3**).

55.     In the Huard Confidentiality Agreement, Huard agreed that a material breach of the agreement would result in irreparable harm justifying injunctive relief. (**Exhibit 1**, **¶ 4(c)**).

56.     He also agreed to a South Carolina choice of law and the exclusive jurisdiction of South Carolina. (**Exhibit 1, ¶¶ 4(i) and (j)**).

57.     Concurrently with the Confidentiality Agreement, Huard also executed a Trade Secrets, Confidential Information, and Non-Solicitation Agreement ("Huard Non-Solicitation Agreement")[3] as part of his initial employment. (**Exhibit 2**).

58.     The Huard Non-Solicitation Agreement also contains industry-standard and narrowly tailored restrictive covenants.

59.     In the Huard Non-Solicitation Agreement, Huard agreed to abide by specific post-employment obligations concerning the retention, use, and disclosure of Plaintiff's trade secret and confidential information.

60.     For example, he agreed that, during his employment and for a period of twenty-four (24) months thereafter, he would not use—directly or indirectly—or disclose any of Plaintiff's confidential information for his own benefit or for the benefit of any other person or entity. (**Exhibit 2, ¶ 2**).

61.     In the Huard Non-Solicitation Agreement, Huard also promised to comply with certain post-employment obligations related to the non-solicitation of Plaintiff's customers, including that, during and for a period of twelve (12) months following his employment with Plaintiff, he would not, on his own behalf or on behalf of any business other than Plaintiff that removes, process, or disposes of heavy sludge, directly or indirectly, without Plaintiff's consent, call on, solicit, divert, or take away from Plaintiff any current or prospective customer of Plaintiff to whom he sold or marketed products or services on behalf of Plaintiff within twenty-four (24) months prior to his separation of employment from Plaintiff:

---

[3] The Confidentiality Agreements and Non-Solicitation Agreement signed by Huard, Gordon, and Higginbotham referenced herein are collectively referred to as the "RCAs."



> **4. Non-Solicitation of Customers**
>   a.  While employed by Employer, Employee will not, on Employee's own behalf or on behalf of any business other than Employer that removes, processes, or disposes of heavy sludge, directly or indirectly, without Employer's prior written consent call on, solicit, divert, or take away from employer any current or prospective customer of Employer.
>   b.  Additionally, for a period of twelve (12) months after Employee's separation from employment for any reason (whether such separation is voluntary or involuntary or for cause or without cause), Employee will not, on Employee's own behalf or on behalf of any business other than Employer that removes, processes, or disposes of heavy sludge, directly or indirectly, without Employer's prior written consent, call on, solicit, divert, or take away from Employer any current or prospective customer of Employer to whom Employee sold or marketed products or services on behalf of Employer within twenty-four (24) months prior to Employee's separation from employment.
> **5. Restrictive Covenant**  Employee acknowledges that the non-solicitation covenant set out in this Agreement is reasonable and necessary to protect the legitimate interests of Employer. Employee represents and warrants that Employee's experience and capabilities are such that such covenant will not prevent Employee from earning an adequate livelihood and that Employee will be fully able to earn an adequate livelihood for Employee and Employee's dependents if such covenant should be specifically enforced against Employee.

(**Exhibit 2, ¶ 4**).

62.     In the Huard Non-Solicitation Agreement, Huard further agreed to an equitable tolling provision, under which the duration of the restrictions on Huard's duty to protect Plaintiff's confidential information and to refrain from soliciting its customers will be extended by any period during which he is or was in breach of those obligations. (**Exhibit 2, ¶ 7**).

63.     Significantly, Huard negotiated these non-solicitation terms, requesting that Paragraph 4.b. only apply if his separation from employment was voluntary.

64.     Plaintiff agreed to this request and added (or requested the insertion of) this exception into the contract. (**Exhibit 2, p. 3**).

65.     Notably, Huard voluntarily resigned from employment with Plaintiff and, therefore, these restrictions are applicable.

66.     Plaintiff hired Gordon on or about December 3, 2012.

67.     During his employment with Plaintiff, Gordon worked in several important roles for Plaintiff, including his last position therewith as Solutions Sales Manager.

68.     As Plaintiff's Solutions Sales Manager, Gordon had material contact with and had confidential information about Plaintiff's clients and prospective clients.

69.     As part of his initial employment with Plaintiff, Gordon executed a Confidentiality Agreement that contains terms that are similar to the terms and obligations set forth in Huard's RCAs. (**Exhibit 3**).

70.     Gordon later reconfirmed his confidentiality obligations in a Confidential Information and Intellectual Property Agreement, which also contains valid South Carolina choice of law and exclusive jurisdiction provisions.  (**Exhibit 4**.)

71.     In his RCAs, Gordon promised to comply with certain post-employment obligations related to Plaintiff's confidential information, clients, and prospective clients.

72.     Gordon agreed he would not reveal confidential information concerning Plaintiff's methods or forms, or the knowledge, information, or experience acquired by him while employed for Plaintiff.

73.     He further agreed that, during his employment and for twelve (12) months following his separation, he would not directly or indirectly solicit, call on, or attempt to sell to any of Plaintiff's clients for the purpose of selling competitive products or services. (**Exhibit 3, ¶ 5**). While this restriction applies to all of Plaintiff's clients, the restriction is limited to only (12) twelve months.

74.     In addition, Gordon last worked for Plaintiff as its Solutions Sales Manager and as such, he had material contact with Plaintiff's clients and had confidential information about Plaintiff's clients.

75.     Plaintiff hired Higginbotham on or about September 19, 2013.

76.     During his employment with Plaintiff, Higginbotham worked in many important roles for Plaintiff, including his last position as Chief Commercial Officer for the Refinery Services Group.

77.     In the scope of his employment, Higginbotham had material contact with and obtained confidential information about Plaintiff's clients and prospective clients.

78.     As part of his initial employment with Plaintiff, Higginbotham executed a Confidentiality Agreement Contract that contains confidentiality terms that are the same as the terms and obligations set forth in Gordon's Confidentiality Agreement. (**Exhibit 5**).

79.     Higginbotham subsequently reconfirmed his confidentiality obligations by entering into a Confidential Information and Intellectual Property Agreement, which also contains valid South Carolina choice of law and exclusive jurisdiction provisions.  (**Exhibit 6**).

80.     Higginbotham further acknowledged his ongoing compliance with confidentiality obligations and restrictive covenants—specifically those related to noncompetition, nonsolicitation/noninterference, nondisparagement, and the return or property—in a Class B Unit Agreement.[4]

81.     In his RCAs, Higginbotham promised to comply with certain post-employment obligations related to Plaintiff's confidential information, clients, and prospective clients.

82.     For example, Higginbotham agreed he would not reveal confidential information concerning Plaintiff's methods or forms, or the knowledge, information, or experience acquired by him while employed for Plaintiff.

83.     He further agreed that, during his employment and for twelve (12) months following his separation, he would not directly or indirectly solicit, call on, or attempt to sell to any of Plaintiff's clients for the purpose of selling competitive products or services. (**Exhibit 5, ¶ 5**).

---

[4] This agreement contains a Delaware choice of law and forum provision and any litigation related to that agreement will be pursued consistent with those provisions.

84.     While this restriction applies to all of Plaintiff's clients, the restriction is limited to only twelve months.

85.     In addition, Higginbotham last worked for Plaintiff as the Chief Commercial Officer, Refinery Services Group, and in this role, he had material contact with Plaintiff's clients, supervised such contact, and had confidential information about Plaintiff's clients.

86.     Throughout their employment with Plaintiff, the Individual Defendants had substantial contact with Plaintiff's clients, prospective clients, and employees, and had extensive access to Plaintiff's trade secret and confidential information.

87.     The confidential and trade secret information the Individual Defendants received and had access to as employees of Plaintiff included, but was not limited to, the identity of and full terms of the relationship with Plaintiff's customers and prospects, customer lists and preferences, prospect targets and negotiations, sales data, financial and pricing information, product and services information, business operations and plans, and marketing plans and efforts.

88.     Plaintiff's confidential and trade secret information is not publicly available.  The Individual Defendants only had access to this information as employees of Plaintiff.

**B.  DEFENDANTS' COORDINATED EFFORTS WITH PLAINTIFF'S EMPLOYEES**

89.     The Individual Defendants began planning and coordinating their attack on Plaintiff's business through VEP while still employed with Plaintiff.

90.     After Huard and Gordon resigned from Plaintiff and officially joined and/or commercially engaged with VEP, they continued to coordinate their attack with other individuals who were employed by Plaintiff.

91.     Defendants coordinated their attack while Higginbotham was employed by Plaintiff, using Plaintiff's information and business opportunities which he became aware of during his employment.

92.     During his employment, Higginbotham was required to act in the best interest of Plaintiff.

93.     However, he worked with the other Defendants to assist them in violating the RCAs, tortiously interfere with Plaintiff's contracts and prospective contractual relationships, and conspired to help the other Defendants unfairly compete with Plaintiff, as described further below.

94.     VEP also enlisted the help of Roberto "Beto" Gomez, a former employee of Plaintiff who is now employed by VEP.

95.     Gomez has participated in the Defendants' unlawful business practices to steal Plaintiff's information, clients, business opportunities, and prospects.

### C. <u>EXAMPLES OF VIOLATIONS DISCOVERED TO DATE</u>

96.     The Individual Defendants have improperly and unlawfully used Plaintiff's client and employee relationships—gained through their employment with Plaintiff—and used their access to Plaintiff's trade secret and confidential information to unlawfully benefit themselves, VEP, and to harm Plaintiff.

97.     Notably, during their tenure with Plaintiff, the Individual Defendants not only maintained direct contact with VEP, but also disclosed and discussed Plaintiff's trade secret and confidential information with VEP.

98.     During and following their employment with Plaintiff, Gordan and Huard unlawfully solicited Plaintiff's clients on behalf of themselves and VEP, some examples of which are discussed below. Higginbotham assisted with these efforts.

**Client Z Interference[5]**

99.     Client Z was a prospective customer of Plaintiff.

100.    In early 2025, Plaintiff started discussing a kiln project for Client Z in California.

101.    In April of 2025, Plaintiff brought Higginbotham into the discussions regarding this opportunity.

102.    The day after learning of the opportunity, Higginbotham notified Huard (who was already working with VEP) of the opportunity.

103.    Higginbotham and Huard communicated by phone and email about this opportunity with Client Z, all while Huard was working with VEP.

104.    Upon information and belief, Higginbotham attempted to divert this opportunity away from Plaintiff and to Defendants.

105.    Notably, when Huard resigned from Plaintiff, he notified Plaintiff that he was not interested in helping Plaintiff with any work transition issues.

106.    Thus, after Huard's resignation, he was only communicating with Higginbotham about these opportunities to benefit himself and VEP.

107.    Higginbotham never disclosed his communications with Huard about these opportunities and, rather, he tried to keep these communications hidden from Plaintiff.

**Client E Interference**

108.    Plaintiff provided services to Client E in or around 2023.

109.    These services were suspended in or around 2024 due to budgetary constraints, with Client E expressly indicating an intention to resume business with Plaintiff in 2025.

---

[5] Plaintiff is not listing the clients at issue by name because it considers the identity of its clients and relationships to be confidential information. Plaintiff will be seeking the Court to enter its standard Confidentiality Order in this case to protect its confidential and trade secret information.

110.    Huard and Gordon—both of whom had extensive and material involvement with Client E regarding the contract, including providing pricing information—resigned from Plaintiff between March and April 2025.

111.    One of Huard's primary job responsibilities for Plaintiff for at least the last fourteen (14) years of his employment was to provide pricing to vendors and clients.

112.    Thus, he was very familiar with Plaintiff's confidential and trade secret pricing information in general, and specifically related to Client E.

113.    Similarly, as Plaintiff's Solutions Sales Manager, Gordon was intimately involved with Client E.

114.    Upon information and belief, part of the reason Gordon and Huard resigned from Plaintiff was to pursue a contract with Client E through VEP.

115.    In or about 2024, VEP purchased a site for the purpose of directly competing with Plaintiff and to obtain 2911 Oil Bearing Hazardous Secondary Material ("OBHSM") exclusion status.

116.    This 2911 OBHSM exemption is a refinery-to-refinery exclusion that allows qualifying refineries to ship materials and recoverable products between one another without categorizing those materials as hazardous waste.

117.    The production of recovered oil is the primary objective of this sustainability-focused exemption.

118.    To meet the technical and infrastructure criteria, a company must function as a refinery and demonstrate the ability to recover oil from eligible materials.

119.   The presence of on-site centrifuges and distillation systems is commonplace to fulfilling these requirements, as they enable the facility to accept OBHSM and effectively recover oil.

120.   VEP obtained its 2911 OBHSM qualification in or prior to April of 2025.

121.   VEP obtained this 2911 OBHSM exemption with the help of Huard and Gordon for the purpose of competing with Plaintiff for work with Client E.

122.   Shortly after VEP obtained this exemption status, Gordon's former Plaintiff-issued email address appeared in communications from VEP and its affiliates concerning efforts to secure a contract with Client E.

123.   These emails included VEP's proposal for Client E's contract. Significantly, Huard was also copied on this proposal as a VEP representative.

124.   These emails prove that Gordon and Huard were both involved in targeting and soliciting Client E for VEP, all in violation of their RCAs; that they were using Plaintiff's confidential and trade secret information to solicit Client E; and that they were working with VEP to undercut Plaintiff's relationship with Client E and steal the business from Plaintiff.

125.   Higginbotham was charged with monitoring Gordon's Plaintiff-issued email account following Gordon's resignation from Plaintiff.

126.   As a result, Higginbotham was aware of VEP proposal for Client E, and was aware of Gordon's and Huard's involvement with VEP related to soliciting Client E.

127.   Despite having this extremely relevant knowledge, Higginbotham failed to disclose this fact to Plaintiff and, instead, intentionally withheld this information to protect Defendants, as explained further below.

128.    Instead of notifying Plaintiff of this threat, Higginbotham forwarded this proposal to his personal email account.

129.    With the help of the Individual Defendants, VEP was able to establish operations to solicit Client E and undercut Plaintiff's pricing.

130.    As a result of Defendants' interference with Client E, Client E began challenging Plaintiff's pricing and ultimately awarded VEP the contract.

131.    Higginbotham knew that VEP was taking this contract from Plaintiff weeks before Plaintiff had any information about this, and Higginbotham intentionally withheld this information to further assist VEP's efforts.

132.    Because of Defendants efforts to solicit Client E without Plaintiff's knowledge of the scheme and the individuals involved, and without Plaintiff knowing of the use of its information, Plaintiff was not able to take proper steps to protect this opportunity and win this contract.

**Client PM Interference**

133.    In early May 2025, Higginbotham exchanged several emails with Huard concerning pricing information for crude oil related to an opportunity with Client PM. This was another effort to divert Plaintiff's business to VEP.

**Client FH Interference**

134.    Some or all the Individual Defendants have also assisted VEP with taking Client FH away from Plaintiff.

135.    Plaintiff has received information that at least Huard was involved in taking this client and moving their business to VEP.

**The Cover Up**

136.    Knowing VEP's attack on Plaintiff's business and his involvement therewith, in May of 2025, Higginbotham prepared a presentation for Plaintiff that stated that VEP was a competitor but that no former employees of Plaintiff were working with VEP.

137.    Despite knowing Huard's and Gordon's involvement with VEP, Higginbotham attempted to hide such knowledge and prevent Plaintiff from learning of Defendants misconduct while its clients were being solicited.

138.    Upon information and belief, Defendants were aware of Higginbotham's efforts and coordinated with him to hide their misconduct.

139.    After other employees of Plaintiff conveyed their belief that Huard and Gordon were involved with VEP to Higginbotham and recommended that he update his presentation to reflect this involvement, Higginbotham failed to do so, attempting to keep this involvement a secret from Plaintiff while Defendants attempted to steal Plaintiff's information and clients.

**Gomez's Involvement**

140.    Defendants also conspired with former Plaintiff employee Gomez. Gomez left Plaintiff on March 14, 2025, to work as the Program Manager for VEP.

141.    After Gomez resigned from Plaintiff but prior to his departure, he emailed trade secret and confidential information concerning Crude Separation Unit ("CSU") yields and the monitoring thereof to his personal email account, for the purpose of competing with Plaintiff on behalf of VEP.

142.    Information relating to CSU yields play a critical role in determining the types and quantities of products a refinery project can produce. Such information influences the overall efficiency and profitability of the refinery.

143.    Moreover, on or about April 24, 2025, after Gomez's resignation and departure from Plaintiff, he was observed at Plaintiff's facility photographing machinery and other laboratory equipment while discussing potential employment opportunities at VEP with Plaintiff's employees.

144.    Gomez was attempting to obtain information about the equipment and manufacturers of equipment used by Plaintiff to assist VEP in obtaining similar equipment to compete with Plaintiff.

145.    During his unauthorized visit to Plaintiff's Strang Road facility, Gomez disclosed that VEP was in the process of bringing its centrifuge operations online—an established capability already possessed by Plaintiff—and made comments about attempting to recruit Plaintiff's employees.

146.    Significantly, on or about May 23, 2025, Higginbotham made an unusual request for a sample of centrifuge cake, a non-liquid material produced by the centrifugal thickening and dewatering process that is used in wastewater treatment and other industrial applications, at CSU and a corresponding waste profile to be picked up at the Strang Road facility.

147.    This marked the first time Higginbotham had ever made such a request, and he failed to provide any explanation for it.

148.    Notably, this request aligns with information disclosed by Gomez indicating that VEP was in the process of operationalizing a centrifuge.

149.    Upon information and belief, Gomez took a photograph of the centrifuge in question during his unpermitted visit to the Strang Road facility.

**Defendants' Knowledge, Encouragement, Participation, and Unjust Enrichment**

150.    At all times material hereto, VEP knew that the Individual Defendants had contractual obligations with Plaintiff and that its employees had a duty of loyalty to Plaintiff.

151.    VEP knew that the information being used by Defendants constituted Plaintiff's confidential and trade secret information.

152.    However, VEP continued to encourage and aid the violations of the RCAs and continued its plan to benefit from those violations.

153.    Each of the Individual Defendants was aware that the others had signed RCAs with Plaintiff, were aware of the legal obligations not to use or disclose Plaintiff's confidential and trade secret information and knew that Plaintiff's employees had a duty of loyalty to Plaintiff.

154.    Higginbotham even confirmed knowledge of the RCAs of Huard and Gordon during his separation meeting.

155.    Nevertheless, they collectively solicited, influenced, and encouraged one another to resign from Plaintiff, violate their RCAs, and encouraged Plaintiff's employees to violate their duty of loyalty.

156.    In sum, Defendants—acting in concert with both former employees of Plaintiff— are actively engaged in an ongoing conspiracy to misappropriate Plaintiff's clients, prospective business opportunities, employees, confidential information, and trade secrets, while employing unlawful business practices.

157.    Plaintiff seeks the assistance of this Court to stop Defendants in their tracks, prevent these unfair and unlawful business practices, prevent the disclosure and use of Plaintiff's trade secret and confidential information, stop the solicitation of, and interference with, Plaintiff's

clients, prospects, and employees, and to issue severe remedies and penalties for these intentional violations.

158.    Defendants' conduct has resulted in and will continue to result in significant irreparable harm and lost business to Plaintiff. *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985) (the possibility of permanent loss of customers to a competitor or possible loss of good will satisfies the irreparable harm prong of the *Blackwelder* standard in a case where a broker, subject to non-compete and non-solicitation clauses, changed brokerage firms.). Accordingly, Plaintiff seeks the assistance of this Court in remedying these legal violations.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Contract)**
**(Against The Individual Defendants)**

159.    Plaintiff re-alleges the allegations above as if they are fully set forth herein.

160.    The Individual Defendants' respective RCAs are supported by valuable consideration, including initial employment as well as access to Plaintiff's trade secret and confidential information.

161.    The restrictions in the Individual Defendants' RCAs are reasonable in duration and scope and are narrowly tailored and reasonably necessary to protect Plaintiff's legitimate business interests, which business interests include Plaintiff's confidential information, substantial relationships with Plaintiff's existing and prospective clients, goodwill in the relevant market area, skilled and trained workforce, and referral source relationships.

162.    The Individual Defendants have violated their respective RCAs by retaining, misappropriating, using, and/or disclosing Plaintiff's trade secret and confidential information in connection with their work for themselves and VEP, to Plaintiff's detriment.

163.    The Individual Defendants have breached their respective RCAs by engaging in conduct that, unless enjoined, will result in the loss of Plaintiff's clients to Defendants, including the solicitation of, and interference with, Plaintiff's clients and prospective clients.

164.    The Individual Defendants breached their respective RCAs by soliciting, calling on, selling to and encouraging Plaintiff's clients/prospects to cease or refrain from doing business with Plaintiff in favor of Defendants.

165.    The Individual Defendants breached their respective RCAs by: (a) consulting with each other about resigning their employment with Plaintiff and working together and on behalf of VEP; (b) recruiting and soliciting each other to work for a competitor; (c) recruiting and soliciting other employees to work for a competitor; (d) conspiring to immediately start working to move as much of Plaintiff's business and proprietary information as quickly as possible, to help launch and sustain business opportunities for VEP and provide it an unfair competitive advantage over Plaintiff.

166.    All the Individual Defendants' conduct described above has occurred within the restricted time periods in their respective RCAs, which applied during their employment with Plaintiff and for certain periods thereafter.

167.    As a direct and proximate result of their actions, the Individual Defendants caused and will continue to cause Plaintiff to suffer damages, including, but not limited to, the loss of clients, the loss and improper use of its confidential information, the loss of its valuable employee

relationships, and increased costs associated with efforts to maintain and service existing client relationships.

168.    While Plaintiff seeks monetary damages, it does not have an adequate remedy at law and an injunction is necessary to stop the Individual Defendants from further violating their respective RCAs.

169.    Public interest supports the entry of injunctive relief.

170.    Plaintiff is entitled to a temporary restraining order and a preliminary injunction prohibiting the Individual Defendants' ongoing breaches of their respective RCAs.

171.    Plaintiff is entitled to an order tolling the restrictions in the RCAs based on the period of the Individual Defendants' violations.

172.    By reason of the foregoing, the Individual Defendants are also liable to Plaintiff for actual and consequential damages in an amount to be determined at trial.

173.    Because of these breaches of contract, Plaintiff has been required to retain counsel to prosecute its claims.

174.    Plaintiff has agreed to pay their counsel for the reasonable attorneys' fees and expenses incurred on Plaintiff's behalf in this lawsuit.

175.    Plaintiff is also entitled to recover its reasonable and/or necessary attorneys' fees and costs incurred in the prosecution of this lawsuit.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contractual and Prospective Contractual Relations)
### (Against All Defendants)

176.    Plaintiff re-alleges the allegations above as if they are fully set forth herein.

177.    The Individual Defendants have improperly diverted business opportunities away from Plaintiff, have interfered with Plaintiff's relationships with its employees and clients, and

have solicited clients to not conduct business with Plaintiff and instead move their business to the Defendants.

178.    The Defendants were aware of Plaintiff's contracts and prospective contracts with its clients and prospects and have induced and intend to intentionally induce the breach of these contracts and prospective contracts.

179.    The Defendants were aware of Plaintiff's contracts with its employees and have procured and induced the breach of these contracts.

180.    VEP was aware of Plaintiff's contracts with the Individual Defendants and was aware that the contracts contained RCAs.

181.    Despite this knowledge, VEP has engaged with the Individual Defendants, encouraged them to breach their contracts with Plaintiff, and has attempted to benefit financially from these breaches.

182.    VEP knowingly interfered with Plaintiff's contracts with the Individual Defendants, caused and contributed to the Individual Defendants' breaches of their contracts, benefited from the Individual Defendants' breaches, and will continue to benefit from these breaches without immediate action by this Court.

183.    Because of Defendants' wrongful acts, Plaintiff has lost and will lose: (a) business opportunities; (b) the value of their trade secret and confidential information; (c) clients, prospective clients, and employee relationships; (d) their skilled and trained workforce; and (e) Plaintiff's client and market goodwill.

184.    By reason of the foregoing, the Defendants are also liable to Plaintiff for actual and consequential damages in an amount to be determined at trial.  Defendants' conduct has been willful and support an award of punitive damages.

185.    Defendants' actions have caused, and will continue to cause, immediate and irreparable harm to Plaintiff.

186.    Plaintiff has no adequate remedy at law.  Plaintiff is entitled to a temporary restraining order, preliminary injunctive relief, actual damages, compensatory damages, and punitive damages against all the Defendants.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)
### (Against All Defendants)

187.    Plaintiff re-alleges the allegations above as if they are fully set forth herein.

188.    Defendants' improper conduct as alleged above has and will continue to enable Defendants to compete unfairly with Plaintiff.

189.    Defendants' conduct was wrongful and performed in a malicious manner to harm Plaintiff and to unjustly enrich Defendants at Plaintiff's expense.

190.    Defendants, through their wrongful conduct as described herein, have unjustly enriched themselves at Plaintiff's expense.

191.    The circumstances are such that it would be unfair to allow Defendants to retain the value of the benefit they have conferred upon themselves at Plaintiff's expense.

192.    As a direct and proximate cause of Defendants' improper conduct, Defendants have been unjustly enriched in an amount to be determined at trial, and Plaintiff is entitled to the recovery and disgorgement of all profits, earnings, and commissions attributable to Defendants' wrongful actions.

### FOURTH CAUSE OF ACTION
### (Violation of the South Carolina Unfair Trade Practices Act)
### (Against All Defendants)

193.    Plaintiff re-alleges the allegations above as if they are fully set forth herein.

194.    Defendants have committed and are continuing to commit unfair or deceptive trade practices in violation of S.C. Code Ann. § 39-5-10 to -160, commonly known as the "Unfair Trade Practices Act" ("UTPA").

195.    Defendants will continue to use improper methods, including those identified above, to interfere with Plaintiff's business relationships, to harm Plaintiff, and to benefit Defendants.

196.    Defendants have actively targeted Plaintiff's clients, trade secret and confidential information, and Plaintiff's key employees.

197.    Defendants' targeting of Plaintiff's employees, information, and clients in this manner constitutes an unfair business practice.

198.    Defendants' activities have occurred in pursuit of interstate business activity and are therefore in the "stream of commerce" as defined by South Carolina law.

199.    Defendants' actions have affected commerce in that they adversely and substantially affect business activity.

200.    Defendants' actions have an adverse impact on the public interest. Unless stopped, Defendants will repeat this conduct in the future.

201.    Defendants' actions were performed knowingly, willfully, intentionally and/or maliciously, and constitute unfair and deceptive acts, practices, and unfair methods of competition in violation of S.C. Code Ann. § 39-5-10 to -160.

202.    Accordingly, pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiff brings this action to recover actual damages.

203.     Furthermore, as provided in S.C. Code Ann. § 39-5-140(a), Plaintiff seeks an award of three times actual damages, reasonable attorney's fees and costs, and any other relief this Court deems necessary and proper.

### FIFTH CAUSE OF ACTION
**(Breach of Duty of Loyalty)**
**(Against the Individual Defendants)**

204.     Plaintiff re-alleges the allegations above as if they are fully set forth herein.

205.     The Individual Defendants owed a duty of undivided and unqualified trust, confidence, and loyalty to Plaintiff by virtue of their employment with Plaintiff.

206.     Huard breached his duties to Plaintiff by failing to continue to advance Plaintiff's business interests.  Huard stopped working in the best interests of Plaintiff before his resignation on or about March 19, 2025, and effectively started focusing his interests on benefiting himself and VEP while still employed by Plaintiff.

207.     Huard breached his duties to Plaintiff during and after his employment, by, among other things, stealing Plaintiff's trade secrets and confidential information for his and VEP's benefit, directly and indirectly soliciting and inducing Plaintiff's employees to terminate their employment with Plaintiff and commence employment with VEP, identifying to VEP Plaintiff's key employees for purposes of recruiting them to VEP, and, while still employed with Plaintiff, notifying Plaintiff's largest clients of his impending departure and soliciting Plaintiff's clients on VEP's behalf in an effort to assure that Plaintiff's clients would move with Huard to VEP.

208.     Higginbotham breached his duty of loyalty by sending Plaintiff's confidential information to Huard, Gordon, and VEP during his employment with Plaintiff.

209.     Higginbotham breached his duty of loyalty by diverting Plaintiff's business opportunities to Huard, Gordon, and VEP during his employment with Plaintiff.

210.    Higginbotham breached his duty of loyalty by concealing information he had about VEP's competitive activities, the involvement of Huard and Gordon in those activities, and the theft of Plaintiff's clients and prospective clients.

211.    The Individual Defendants breached their duties to Plaintiff during and after their employment, by, among other things, stealing Plaintiff's trade secret and confidential information for their use and VEP's benefit, directly and indirectly soliciting, inducing and encouraging Plaintiff's employees to terminate their employment with Plaintiff and commence employment with VEP, and coordinating efforts to quickly solicit Plaintiff's employees and to ensure they had as much information as possible to do so and unfairly compete with Plaintiff.

212.    The Individual Defendants did all the above to prosper in their relationships with VEP at Plaintiff's expense.

213.    The Individual Defendants acted maliciously and with willful and wanton disregard for Plaintiff's rights and property.

214.    By reason of the foregoing, the Individual Defendants are liable to Plaintiff for actual, compensatory, and punitive damages in an amount to be determined at trial.

215.    Plaintiff also seeks all compensation paid to the Individual Defendants by Plaintiff during the period they were disloyal to Plaintiff.

## SIXTH CAUSE OF ACTION
### (Violation of South Carolina Trade Secret Protection Act)
### (Against All Defendants)

216.    Plaintiff re-alleges the allegations above as if they are fully set forth herein.

217.    Critical to Plaintiff's success is its investment into the development and safeguarding of the trade secret and confidential information central to the business platform.

218.    Through enforcement of lawful confidentiality policies and contractual obligations and implementing other security measures, Plaintiff protects their prized assets – the trade secret and confidential information acquired and developed through continued investment.

219.    Plaintiff devotes substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of Plaintiff.

220.    As alleged herein, Plaintiff treats such information as its trade secrets, which is non-public information concerning the operations, business methods, personnel, costs and finances, marketing plans, research, sales, pricing data and legal affairs of Plaintiff and its clients. Plaintiff's trade secrets include, but are not limited to:

- Information regarding Plaintiff's customers and prospective customers, customer lists, information regarding existing customer preferences, habits and needs, information regarding prospective customers, details of past, pending and contemplated transactions, and customer proposals;

- Information regarding Plaintiff's pricing, including, but not limited to, price lists, pricing policies, and pricing strategies;

- Information regarding Plaintiff's sales, sales data, training materials, and marketing distribution approaches;

- Information developed by Plaintiff regarding its competitors and competitive position;

- Information regarding Plaintiff's services, systems, strategies, designs, processes, procedures, market data, know-how, compilations of technical and non-technical data, advertising, and promotional plans and strategies;

- Information regarding Plaintiff's finances, financial structure, financial condition, assets and liabilities, and projections relating to the business; and

- Information regarding Plaintiff's operations, business plans, business opportunities, project concepts, designs, and drawings, and project research and analyses.

(**Exhibit 2, ¶ 2(b)**).

221. Plaintiff developed, compiled, and acquired its trade secrets at great expense and through substantial efforts. Plaintiff's trade secrets are not readily ascertainable in the waste management industry or in any type of trade or public directory or any other source.

222. The misuse of Plaintiff's trade secrets, whether through the improper disclosure or improper use, would cause significant damage to Plaintiff through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, and other types of harm.

223. As such, Plaintiff takes careful, deliberate actions at great expense to protect against the misuse or wrongful disclosure of Plaintiff's trade secrets.

224. Plaintiff has taken steps reasonable under the circumstances to maintain the secrecy of its trade secrets, such as: (a) emphasizing to employees Plaintiff's need to keep this information a secret; (b) requiring, as a condition of employment, that all employees promise not to use or disclose this information except in the performance of their duties for Plaintiff; (c) having employees execute confidentiality and non-disclosure agreements that instruct Plaintiff's employees not to disclose, reproduce or use this information without Plaintiff's consent; (d) distributing confidentiality policies that all employees must specifically acknowledge, as well as employee handbooks containing confidentiality requirements; and (e) limiting access and/or restricting access to this information by employees on a need-to-know basis.

225.    Further, as part of Plaintiff's efforts to protect its trade secrets, Plaintiff does not allow access to its trade secrets until after certain employees with access thereto execute a written confidentiality agreement whereby they acknowledge they will have access to Plaintiff's trade secrets, promise not to disclose Plaintiff's trade secrets to anyone not authorized to receive it, and to confirm they will not use Plaintiff's trade secrets except for legitimate business purposes for the benefit of Plaintiff.

226.    These employees also agree that confidentiality obligations survive the termination of their employment relationship with Plaintiff, that they will continue to treat Plaintiff's trade secrets as confidential, that they will not disclose Plaintiff's trade secrets to any third party, and that they will not retain Plaintiff's trade secrets.

227.    Finally, the Individual Defendants acknowledged that Plaintiff's trade secrets are the sole and exclusive property of Plaintiff.

228.    Because of the nature of the trade secrets, Plaintiff's commitment to enforce their confidentiality agreements, the fact that the trade secrets derive value by virtue of being confidential, and the fact that the trade secrets cannot be obtained from public sources by competitors, Plaintiff's trade secrets are trade secrets under state and federal law.

229.    In the course and scope of their duties for Plaintiff, Individual Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Plaintiff's trade secrets from use and disclosure for any improper or competitive purpose.

230.    Plaintiff's information as described above constitutes trade secrets under the South Carolina Trade Secrets Act, S.C. Code Ann. §§ 39-8-10, et seq. ("SCTSA"). This trade secret information includes information about Plaintiff's clients, pricing, operations, services, and products.

231.    The Individual Defendants' actions in wrongfully misappropriating and using Plaintiff's trade secrets violated and continue to violate the SCTSA.

232.    The Individual Defendants' actions were as agents and employees of VEP, were for their own personal benefit and VEP's benefit, and occurred at or with VEP's direction, encouragement, knowledge, and authorization.

233.    Defendants' wrongful misappropriation and use of Plaintiff's trade secrets have caused damage to Plaintiff's business relationships and unjustly enriched Defendants.

234.    Defendants' actions in wrongfully misappropriating and using Plaintiff's trade secrets entitles Plaintiff to recover actual damages sustained pursuant to S.C. Code Ann. § 39-8-40(A) and damages for unjust enrichment pursuant to S.C. Code Ann. § 39-8-40(B).

235.    Defendants' actions in wrongfully misappropriating and using Plaintiff's trade secrets were and continue to be willful, entitling Plaintiff to recover exemplary damages pursuant to S.C. Code Ann. § 39-8-40(C) and reasonable attorney's fees pursuant to S.C. Code Ann. § 39-8-80.

236.    The SCTSA provides that "actual or threatened" misappropriation may be enjoined. S.C. Code Ann. § 39-8-50.  Plaintiff seeks and is entitled to an injunction against Defendants related to the actual and threatened misappropriation of Plaintiff's trade secret information.

237.    The conduct at issue constitutes a violation of SCTSA and will continue unless enjoined by this Court, as Plaintiff is without adequate remedy at law and is threatened with irreparable loss, injury, and damage unless the Court grants the relief requested.

238.    Plaintiff seeks and is entitled to an injunction against Defendants related to the actual and threatened misappropriation of Plaintiff's trade secret information.

## SEVENTH CAUSE OF ACTION
**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836,** *et seq.***)**
**(Against All Defendants)**

239.    Plaintiff re-alleges the allegations above as if they are fully set forth herein.

240.    The DTSA forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

241.    "Trade secrets" include "all forms and types of financial, business, scientific, technical, economic or engineering information."

242.    During their employment, the Individual Defendants had access to Plaintiff's trade secrets, as described above.

243.    The Individual Defendants conspired to use and share Plaintiff's trade secrets in concert with and on VEP's behalf and/or misused this information to intentionally damage Plaintiff.

244.    This information was related to multiple products or services used in, or intended for use in, interstate commerce.

245.    This information: (a) is not known outside Plaintiff; (b) is known only by certain of Plaintiff's employees, including the Individual Defendants, and others involved in the business; (c) is subject to reasonable measures to guard the secrecy of the information, including the Individual Defendants' respective RCAs and other policies and practices described above; (d) is valuable; and (e) is difficult for others to properly acquire or independently duplicate.

246.    The Individual Defendants knew they had a duty under their respective RCAs and Plaintiff's policies to maintain the secrecy of Plaintiff's trade secrets.

247.    The Individual Defendants misappropriated and used this information to cause Plaintiff harm.

248.    The Individual Defendants misappropriated and used this information without Plaintiff's knowledge, consent, or authorization to benefit themselves and VEP in a manner that will cause irreparable harm to Plaintiff.

249.    The Individual Defendants' actions constitute actual and continuing misappropriation in violation of the DTSA.

250.    The Individual Defendants' actions were as agents and employees of VEP, were for the benefit of themselves and VEP, and occurred with VEP's encouragement, knowledge, and authorization.

251.    Plaintiff has suffered damages and irreparable harm because of Defendants' breaches of the DTSA.

252.    Plaintiff is entitled to recover actual damages and all damages authorized by the DTSA.

253.    Defendants have willfully and maliciously misappropriated Plaintiff's trade secrets entitling Plaintiff to an award of exemplary damages.

254.    Plaintiff is entitled to recover their costs and attorneys' fees because of Defendants' misappropriation of Plaintiff's trade secrets.

255.    Plaintiff's' damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable and compensatory relief.

256.    Defendants' actions will continue to cause irreparable harm and damages to Plaintiff if not restrained.

## EIGHTH CAUSE OF ACTION
### (Civil Conspiracy)
### (Against All Defendants)

257.    Plaintiff re-alleges the allegations above as if they are fully set forth herein.

258.    Defendants engaged in a corrupt agreement to engage in unlawful activities through their concerted action.

259.    Defendants coordinated to target specific employees of Plaintiff who were willing to join a mass departure and/or knowingly disregard the restrictive covenants in their RCAs in an effort to deprive Plaintiff of the protections and advantages those agreements provide.

260.    Defendants coordinated to steal and misappropriate Plaintiff's confidential information during and after the Individual Defendants' employment with Plaintiff.

261.    Defendants coordinated to target Plaintiff's current and prospective clients, vendors, and other partners to conduct business with VEP both during and after the Individual Defendants' employment with Plaintiff.

262.    Defendants conspired to conceal their unlawful actions from Plaintiff so that it would be too late for Plaintiff to stop the impact of the agreed-upon conspiracy.

263.     Each individual Defendant committed one or more acts to assist in the agreed-upon conspiracy.

264.    The combined and coordinated actions of Defendants have resulted in more harm to Plaintiff than could have been accomplished by each Defendant individually.

265.    Defendants engaged in these wrongful actions for their own benefit and to the detriment of Plaintiff.

266.    As a direct result of Defendants' wrongful actions, Plaintiff has incurred the following actual and special damages: (a) loss of business opportunities; (b) diminished value of

its confidential information; (c) loss of a skilled and trained workforce; and (d) loss of client and market goodwill, along with irreparable harm.

267.     Plaintiff is entitled to injunctive relief, actual damages, and compensatory damages against Defendants.

268.     Based on the willful, malicious, and intentional misconduct of Defendants, Plaintiff seeks punitive damages against Defendants.

## V.     **PRAYER FOR RELIEF**

269.     **WHEREFORE**, Plaintiff respectfully requests that the Court:

A.     Grant injunctive relief enjoining Individual Defendants from directly or indirectly retaining, using, disclosing, and misappropriating Plaintiff's trade secret and confidential information;

B.     Because it is acting in active concert and participation with the Individual Defendants, grant injunctive relief enjoining VEP from directly or indirectly using or disclosing Plaintiff's trade secret and confidential information that the Individual Defendants, or any agent of VEP, has shared with VEP or transferred to VEP devices or systems;

C.     Grant injunctive relief preventing the Individual Defendants from further direct or indirect violations of the RCAs, from soliciting, calling on, attempting to sell to, and from diverting Plaintiff's clients, and prohibiting VEP from further inducing or benefiting from the Individual Defendants violations of their RCAs;

D.     Because it is acting in active concert and participation with the Individual Defendants, grant injunctive relief enjoining VEP from directly or indirectly tortiously interfering with the Individual Defendants' compliance with their RCAs;

E.    Because all Defendants are working in active concert or participation with one another, grant injunctive relief enjoining Defendants from tortiously interfering with Plaintiff's business and contractual relationships and prospective contractual relationships;

F.    Enter an order extending the restrictions in the respective RCAs based on the period of the Individual Defendants' violations;

G.    Order the Defendants to immediately deliver to Plaintiff's counsel all originals and copies of Plaintiff's electronic and hard copy files, documents, information and other property in their possession, custody, or control;

H.    Grant Plaintiff judgment against Defendants for actual, consequential, compensatory, and incidental damages in amounts to be determined at trial, together with pre-judgment interest;

I.    Award liquidated, punitive, double, treble, special and/or exemplary damages in amounts sufficient to punish Defendants for their conduct and to deter Defendants in the future from engaging in such intentional, willful, and wanton conduct, such as Defendants have displayed toward Plaintiff in this case;

J.    Grant Plaintiff judgment against Defendants for all costs, attorneys' fees and other litigation expenses; and

K.    Grant Plaintiff such other and further relief as the Court deems just, equitable, and proper.

Dated:  June 9, 2025

Respectfully submitted,
FORD & HARRISON LLP

s/*Jeffrey A. Lehrer*
Jeffrey A. Lehrer
jlehrer@fordharrison.com
Michael G. Morrison, II
mmorrison@fordharrison.com
100 Dunbar Street, Suite 300
Spartanburg, South Carolina 29306

*Attorneys for Plaintiff*